et al. Oral argument, 15 minutes per side. Mr. Hauber for the appellants. Mr. Hauber for the appellants. Good morning. Good morning. May it please the court, Richard Hauber on behalf of plaintiff appellant. In the back of the courtroom is Natalie Davis and Elise Manchester from my office watching their first Sixth Circuit argument in a pretty stunning courtroom. So thank you for the invitation here. We believe fundamentally this appeal is really about the court's jurisdiction. Ultimately, the issue is whether the court properly dismissed Mr. Koutsoudemis from this case, denied the motion for remand, and exercised diversity jurisdiction over this case. We believe the court exercised or issued its decision relying upon an inappropriate standard with respect to motions for remand and also failed to consider both the facts that were alleged in the original complaint in state court and the ambiguities with respect to state law, all of which had to be construed in a light most favorable to my clients. So what's the error in the standard? That the court would be doing an analysis similar to a summary judgment analysis, which is not the law. So give me the right words or adjectives.  Is plausibility the wrong one? Because we know that's for motion to dismiss. Do you think it's colorable? What's your adjective of choice? The adjective is any colorable or plausible claim against the individual warrants remand to state court. I thought the district court did use those words. He used it in the first paragraph, then said he was going to engage in a dispositive summary judgment analysis. And then what he did is he actually weighed the evidence. If you go through the decision, he took the allegations that we had in the complaint, which under the remand standard, under the fraudulent jointer standard, the court was required to construe it in a light most favorable to us, except our factual allegations. He took the defendant's affidavits and deposition testimony and said, well, these contradict your allegations in the complaint. And in fact, went so far as to say that the overwhelming, at least on the remand order, that the overwhelming evidence contradicted the allegations in the complaint. He engaged in an inappropriate weighing of our allegations versus the affidavit. I mean, there's a little bit of inevitability about this because it's not plausibility and colorability is not just law. I mean, the reason the plausibility standard is there is Justice Breyer in one of these cases said, you know, you allege that this happened because someone in Mars did something. The judge is allowed to say that's not a plausible fact. So I'm going to get, I think, where you want to go, which is, you know, you ultimately have to apply these legal tests. And, you know, a very important one that kind of cuts through a lot of them is what the evidence of actual knowledge by PNC or Mr. Couture Demos is of Antonis committing fraud. I mean, you got to get there at some point. As I understand it, I mean, you can tell me your best one, but, you know, there are things like a signature block. That's getting close to the Mars theory. I mean, why is that plausible? Yeah, I'm happy to address that. So first, we provided significant factual allegations regarding the obligations of the bank and Mr. Couture Demos to, one, know your client, to, two, monitor financial activity under the anti-money laundering statute. Okay, so tell me what you're doing. Are you referring to actual knowledge or are you doing bad faith right now? What are you doing right now? Both. Do one at a time. Okay, so let's talk about actual knowledge. What's your evidence of actual knowledge? The actual knowledge is that the bank has a policy to know their client. Mr. Couture Demos, we weren't relying just on signature blocks. How that policy matters if there's not evidence of actual knowledge of their committing fraud. Well, so now you're talking about evidence of actual knowledge as opposed to the pleading standards associated with. What's the paragraph of the complaint in which you allege actual knowledge of the fraud? Well, we have, I don't know the exact paragraph where we say they had actual knowledge of the fraud. We describe all of the indicia of knowledge through the anti-money laundering provisions where they would identify transactions that create red flags. Such as, for example, when Mr. Antonis transferred money to a Canadian bank intermediary so that it could be transferred to some financial institution that had no relationship with the United States. That creates a red flag. That creates actual knowledge on the part of the bank that these funds are potentially being used inconsistently. Red flags sound like inquiry notice to me. I'm sorry, sound like? Red flags sound like inquiry notice to me. Those types of red flags are notice. When you look at the transactions that we identified in our complaint and then subsequently in the amended complaint, there's not just red flags associated with wire transfers, though there are substantial ones. There are notices where he is taking money and he's, I'll give you an example. We weren't relying just on Mr. Koutsoudemis' signature block. We were relying upon the fact that Mr. Koutsoudemis was actively engaged in certain practices, including speeding up the clearing of a $200,000 check so that Mr. Antonis could then transfer it to someplace inconsistent with the business of his investment fund, the epitome investment fund. And so that's, he was- I just don't understand how that's actual knowledge of fraud. That's what, I mean, I get the point of 12B6 or something even lighter than that. But you still have to have facts. So if the, well, the facts that were alleged, and this is actual knowledge and then I'll go to bad faith. The facts that were alleged was that they would have received notice that these transactions raise issues of potential fraud and that they would have a duty to inquire. They had noticed that these transactions were questionable. That's actual knowledge. But it also goes to the bad faith. You asked me to pick one. It goes to the bad faith standard under INCROD as well, which is you have a substantial number of transactions over an eight-year period where Mr. Antonis was doing business with PNC that raised red flags that should have been investigated. And the failure to do so over this long period of time is evidence of bad faith, which was alleged in the complaint. I can't remember. Was the fraud $30 million? What was the fraud? I'm sorry. Was it $30 million? About $27 million. And this was $200,000. That's your red flag. That was one example we cited. Why is that? Tell me exactly why clearing the check quickly is a red flag. That's not obvious to me. Because of what he needed. The customer asked for something to be done more quickly. Why is that proof? I mean, maybe they were buying a house and this was the down payment. I don't understand why. Well, what you're talking about. For access to it. So part of what you're talking about, and we go back to the standard, is why is that? That's an example that we were aware of. But we haven't done any discovery in this case as it relates to those specific issues. And that's why this circuit has recognized that, one, in fraudulent omission cases, and two, in cases where the evidence is exclusively in the possession of the defendants, that there is a lesser standard for purposes of a 12B6 motion or a fraudulent jointer motion. And in that regard, what you're referring to is actual notice. Notice, as it relates to fraud, does not need to be pled with specificity under Civil Rule 9B. Anything relating to knowledge and the issues of mind under 9B are not required to be pled with specificity. And so while other fraud claims require allegations of time, place, and content, acts of omission do not, under this circuit's jurisprudence, and the issues of actual knowledge, which you are focused on in this questioning, does not need to be pled with specificity under Civil Rule 9B. We've alleged that they had actual notice. We also allege that they acted in bad faith by not acting on these red flags. With the information available to us at the time, we provided a very detailed complaint regarding specific transactions that raise anti-money laundering red flags that required the bank and Mr. Kuchedemis to act to do something about it. But in addition to fraud, there's the issue of negligence and the Uniform Fiduciary Act, all of which would give rise, potentially, to claims against Mr. Kuchedemis when construing the facts in the complaint in a light most favorable to us. The court took their affidavits and, to the extent that the affidavit was inconsistent with the allegation of the complaint, weighed the credibility of the affidavit and accepted the affidavit over the allegations of the complaint. There are multiple claims that were asserted and multiple basis upon which this court could have remanded, including the allegations of aiding and abetting both tortious conduct because, even though Ohio hasn't yet recognized it, this circuit has said, quote, when there is a glimmer of hope, then the court should construe the law in favor of the plaintiff. And in the state of Barney case, the Sixth Circuit, after DeVries, referred to whether Ohio would recognize it as highly doubtful but not impossible, i.e. a glimmer of hope. But as an example of that glimmer of hope, the Pennsylvania Supreme Court— The glimmer of hope language, is that from the U.S. Supreme Court? Where is that? I don't remember which case it's from. I love the idea for a lot of reasons. I'm just not sure it's the test here. The glimmer of hope comes from—let me find my— I'm not going to be the one that puts my name to rejecting glimmers of hope. I just want to know where it comes from. I like the idea, but I just— So the question is whether we're going to interpret the law favorably to my client on the issue of aiding and abetting. The Pennsylvania Supreme Court, until 2024, had never recognized aiding and abetting tortious conduct. The Supreme Court in Ohio in 2012 refused to recognize it in the DeVries case, but on the facts of that case— But haven't we in Ohio appellate courts kind of come along and said it doesn't exist until the Supreme Court of Ohio changes its mind? The courts have said the Supreme Court refused to accept it under the facts of DeVries. The facts in DeVries are very, very different. And the movement amongst the courts— Until they changed the first clause of that sentence. Which is why we actually alleged in our complaint, we recognized that the Supreme Court in DeVries had said, we don't recognize a tortious interference claim. I'm sorry, a tortious—or a aiding and abetting tortious conduct claim. But we believe they should. And that the authority from— We should. No, no. We filed in state court. We argued that the court should. We recognize and we believe we properly named Mr. Crutrademus. We recognize that the Summit County Court of Common Pleas would be the first place to have to address that issue. We also recognize— Remember, did you try certification? I can't remember. We did at the lower court suggest that the court certify the issue to the district court. And he declined on the basis that he said, there's no reason for me to predict that the court would reach a different conclusion. But we maintain that Marion versus Bryn Mawr out of Pennsylvania Supreme Court is a reason to predict that they might reach a different conclusion. And I note that my time is up. All right, thank you. Get your full rebuttal. We'll hear from Mr. Stanton. Good morning. Good morning, your honors. May it please the court, Andy Stanton from Jones Day. On behalf of Appalese, Jim Crutrademus, and PNC Bank, I'm here with my partner, Susan Kessler. So I think you were putting your finger, Judge Sutton, on the real problem here, which is that this original complaint, which was operative at the remand decision, essentially has no facts pled in it. There is no allegation in this complaint that could be taken as describing a fraud scheme. The word fraud is used a lot, but there are no well-pled facts. Indeed, the plaintiffs themselves affirmatively allege that they don't know what Mr. Antonis did with the money. If you look at paragraph 47 of the original complaint at page ID 156, both versions of the complaint allege that Antonis lost plaintiff's money through, quote, incompetence or another unknown motive. Now, the next paragraph of the complaint says that Antonis falsified brokerage statements from Interactive Brokers, which is not PNC Bank and not related to PNC Bank. Is there litigation involving the brokerage? Interactive Brokers was sued. They won a dismissal. It was overturned, and it's currently pending. Their appeal of that decision is pending before the Ohio Supreme Court. There was extensive state court litigation against Mr. Antonis' estate and his family and extensive discovery taken. Mr. Coutrademos was deposed. His deposition transcript was before the district court on the remand proceedings. After all of that, the plaintiffs' description of the fraud, and this is in their brief on this appeal at page 19, and I would urge the court to look at this. They say, quote, specifically, the investor group alleged that Coutrademos knew Antonis personally, understood Antonis as an inexperienced and high-risk investor, communicated regularly with Antonis regarding Antonis' banking with PNC, held himself out to be Antonis' relationship manager, knew Antonis' transactions were highly suspicious, if not fraudulent, and inconsistent with Epitome's business purpose, approved Antonis' fraudulent transfers, and had a duty to comply with anti-money laundering regulations. Thus, Coutrademos played a central role in the perpetuation of Antonis' fraud and had sufficient notice to prepare an effective response and defense. You can't pull a rabbit out of a hat if you don't have a rabbit or a hat. There is absolutely no description anywhere in these pleadings as to what happened. It's completely plausible that Mr. Antonis set out with the best of intentions, that he started a fund, he invested the money, he was really bad at it, he lost all the money through bad investments, got scared, and falsified brokerage statements. That part of it, they've alleged as a fraud, but beyond that, they've alleged no fraud, and without a fraud, you can't have a colorable claim. The district court got the standard right, and I don't think there's a disagreement about the standard. Right, what's the right language? So, Coyne and Walker are the lead cases, and it's colorable claim or reasonable basis to predict that a claim would have merit. Do you agree that's easier to meet than motion to dismiss? I do, yes, and we transparently allege that in our removal petition. It is, but you could lower the bar to the basement, and you're not going to get over it in this case, because in addition to the lack of any coherent description of what Antonis did, there are no well-pledged factual allegations about how Mr. Koutroudimos was connected to it. There's discussions that have taken... Well, I mean, just trying to give a little bit of benefit of the doubt, or devil's advocate, I mean, it's fair to say Mr. Koutroudimos was his, quote, banker. Is that unfair? You wouldn't even say that? I would not say that. No, he's not doing the brokerage, but isn't he his key contact at PNC? No. Who's the banker? He didn't have one. This is what the record is. The record is... It's a convenient position for a bank to take, because there is no banker. Well, I mean, I don't have a banker. I use PNC. There's nobody at PNC that's my banker. When I go into the branch, I get in line, and I go see a teller. I could call somebody, but I don't have a banker at PNC. Maybe I should. If somebody emails you and says, I'll expedite this check, I'm your relationship manager... That's not what the email says. Well, just to be clear, Your Honor. Yes, what's in the record, to be clear about what's in the record. And I think we need to also evaluate what's in the record in light of what's in the complaint and what's alleged. Because none of these transactions are actually alleged in the complaint that was operative at the remand decision. No specific transaction was alleged. Types of transactions were listed in one paragraph. But when the record was before the judge, and the judge did pierce the pleadings alternatively in assessing remand, there was a deposition testimony of Mr. Coutradimos, where he testified under oath in response to the question, were you Antonis' relationship manager? No, I was not. There's an affidavit from Mr. Coutradimos reiterating that. There's an affidavit from Steven Pollender, who's a vice... Why isn't Mr. Coutradimos the one who's involved in the $200,000? Can you get access to the funds a little more quickly? I'll get to that in a second. And yes, there are four emails, which I'll talk about in a second. But, yes, he's involved in an email exchange. I guess, help me out for both of you, I'm not sure why you're fighting this fight. I wouldn't have thought giving someone the label the banker or the key contact person at PNC with a preexisting friendship going to the same Greek Orthodox church, I'm just not sure that shows evidence of an actual fraud. No, it doesn't. And I think the district court was right to say you could assume... The reason that we're fighting about it in part, Judge, is because the allegations that are in the complaint, the only factual allegations that are made to tie Coutradimos to whatever Antonis did are he was his relationship manager. That's false. He was close personal friends. That's subjective, but the evidence is that they weren't. So I think you could, I would concede the plaintiffs have made, arguably made, a colorable showing that these two men had a close relationship. I would concede that point. I'll say here, we're required, I'm sorry, to approve the foregoing activity. And that's false. Well, but Judge, the reason I say it's false is because Steve Pollender, who's not Mr. Coutradimos, he reviewed the bank's records. He testified under oath that not only was Mr. Coutradimos not required to approve Antonis' transactions, but there was no person at the bank who was required to approve. Anyone with authority could approve. This is key. There is no evidence in the record at all that Coutradimos actually approved any transaction for Antonis. It's not actually alleged in the original complaint. What's alleged is that he was required to approve. There are no transactions alleged in the original complaint. What about the $200,000? Yeah, so there are four emails. One email is a question from Antonis to Coutradimos about how long it will take for a $200,000 cashier's check to clear. Coutradimos forwards that to a PNC person at the bank who is responsible for that area and says, how long is this going to take? She provides an answer. He gives the answer back to Antonis. That's the email chain. Well, it's not an every day. Listen, in the Sutton household, that's not every day. Not in the Stanton household either, Judge. But I don't know. But here's the problem is that's a routine banking transaction, and people are actually allowed to cash large cashier's checks. And in order to articulate why that's suspicious, you would have to describe, among other things, what did Antonis tell people the business was? What was the cashier's check actually being used for? Why and how is that inconsistent with the representations that were made about what the business was, right? So there's a representation. You tell somebody, we're doing a real estate deal. It turns out it's a Ponzi scheme, right? You can describe that in a complaint. That's the core that's missing here. This isn't an attempt to put a roof on before you have a foundation. There isn't enough information about what happened to the money to draw any inferences about any transactions. And I'll reiterate, they had a full ledger of all transactions for these accounts in the underlying state court proceedings, and it was introduced as an exhibit in Mr. Koutroudimos' deposition, and he was asked questions under oath about transactions. There's no evidence in the record that he approved a single transaction. And this gets to an important nuance, I think, in the standard. Let me interrupt you just for one second. Is it unreasonable to infer that if Koutroudimos was the relationship manager, and I know that your position is he absolutely was not and there's no reason for us to believe that, but if he was, is it unreasonable to infer that he knew the nature of what the company or what he was doing? I think, Your Honor, it would be reasonable to infer that a relationship manager for a business account would know the nature of the business that holds the account. The problem is the pleading doesn't describe the nature of the business or the nature of the fraud. The pleading itself doesn't say this is what it quotes a prospectus in a generic statement from a prospectus saying something like epitome is designed to generate low risk, high returns for investors, something like that. But it doesn't say how. It doesn't say we're going to put the money out in high interest rate loans with a short term, and it doesn't say we're going to invest in real estate. So there's no description of what the business was represented to be, and there's no description of how the fraud was perpetrated. And if you don't have that, you definitionally, as a function of logic, cannot articulate how someone helped you do it or should have known about it or why sending money to Canada, which is one of the things that's in the complaint, is a red flag. You're allowed to do business with Canada. It might be consistent with any number of business purposes. And they don't say why it wasn't. So back to the nuance in the standard. So the legal standard that the trial court applied and had to apply is somewhere below the 12B6 plausibility standard, and that's going to be reviewed by this court for clear error. But the factual findings made are- That would be de novo. Both parties agree in the briefing that the factual findings are reviewed with deference. I got that, but I would have thought the threshold, whether it was colorable, was de novo. That question is, right? But when the factual findings in aid of that showing- I misheard you, sorry. Yeah, no, the factual findings that the court made in aid of the conclusion, which is getting a de novo review, get deference. And the court was very clear that without any articulation of what the fraud scheme is in the most general sense, you simply- you can't get there. So unless the court has other questions, I think the motion to dismiss decision is pretty straightforward. The Uniform Fiduciaries Act and its application here to the claims against PNC, I think, is fairly clear, in that you have to have actual knowledge. They don't get there. If you don't have actual knowledge, you have to have knowledge of facts. And this is from the Ingrot case. So cogent and obvious is the phrase that's used, that to not act would be akin to deliberately avoiding knowledge. That's not- the allegations just don't come close to that. Okay, thank you very much. We understand your argument. Thank you. Okay, so Mr. Haber, you've got a few minutes of rebuttal. Thank you, Your Honor. I'd first like to address what Judge Ritz was asking with respect to the evidence of knowledge, et cetera. Mr. Pollender, who submitted an affidavit, actually in his affidavit said he went back and looked at transactions and there was no evidence that Mr. Koutroudimis was, quote, required to approve wire transfers. What he does not say in his affidavit is that Mr. Koutroudimis did not approve wire transfers. He also says one other thing that's very interesting. You asked who is his banker, who is his relationship manager. Mr. Pollender says he had one. He said from approximately 2018 to 2023 or whatever the period of time was, it was someone other than Koutroudimis, which infers that at some time prior to that, it was, in fact, Mr. Koutroudimis. They've admitted that there's a colorable claim. Wait. Explain that inference. Sure. He said from a period of 2018. These transactions go back to 2013. There was someone other than Mr. Koutroudimis who was the relationship manager. That's Mr. Pollender's affidavit. Why does that imply that? Because he doesn't actually say that prior to that time it wasn't Mr. Koutroudimis, and we have evidence that Mr. Koutroudimis was engaged in conduct which was consistent with being a relationship manager. Why isn't the inference there that there was just no manager, period? There was no relationship manager? Well, they admit there was a manager. They just don't tell us who it is. We haven't been able to do discovery. Pollender admits there was a relationship manager. It was not Koutroudimis. It was somebody else for a period of the last five years. They don't tell us who it is. I suspect it was a non-diverse individual as well who could have potentially been named in the complaint, but they don't disclose that. The issue on 9B, the heightened standard, fundamentally is about giving notice to the defendants what the claims are so that they can fashion a defense. They actually did that in an attempt to get the motion for remand denied. They went back and looked at transactions. They knew exactly what the claims were because we articulated the natures of the transactions. That gets you over Rule 9, just the fact that they have access to all this stuff and they knew something was up. That they knew what the claims were. Here's what the complaint, the original complaint, alleged. It's not just notice. It's that these are very serious allegations. They are very serious. To say someone is involved in fraud, I mean this is a problem in the current world. We too lightly make very serious accusations. It's not a bad idea to say some very serious allegations. You better have some facts behind it before you lightly do this. And I agree with you. That is not about notice. That is about a bigger problem. And we do allege substantial facts in our 23-page complaint regarding these allegations. The fact that there are holes in some of the factual allegations this circuit has recognized is understandable when the fraud transactions take place over a long period of time. When they are complicated. When the facts are uniquely in the possession of the defendants, not in our client. Keep in mind, this isn't the typical case where the fraud is revealed during a criminal prosecution of Mr. Antonis. He killed himself. We don't have his testimony as to what his banking relationship was with PNC. We're at an extreme disadvantage. But we did have information from which to bring these claims against PNC and Kutcher Demas that allows us to survive both the fraudulent joinder standard and the 12B6 standard. My time is up. Thank you very much for your time. Thanks to both of you for your helpful briefs and excellent oral arguments. We very much appreciate it. The case will be submitted.